**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

```
F  I  L  E  D

APR 2 6 2012

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA
```

NORMAN BRADFORD                  )
    Plaintiff,                   )
                                   )
v.                               )        Case No. 1:09cv1226
                                   )
HSBC MORTGAGE CORPORATION,       )
    Defendant.                   )

## MEMORANDUM OPINION

At issue at the conclusion of this long-running TILA[1] matter is the determination of a

reasonable attorney's fee for a TILA claimant who enjoyed only partial success.  This

determination requires resolution of the following three questions:

> (i) whether a TILA claimant who prevails on a § 1641(f)(2) claim against a loan
> servicer for failure to respond properly to the claimant's request for the identity of
> the loan's owner may include in his fee petition the hours his attorney spent
> litigating the owner's identity in pursuit of an ultimately unsuccessful TILA
> rescission claim;

> (ii) whether the fee claim may include the attorney's hours spent litigating the fee
> request itself where, as here, the claimant's favorable judgment was entered
> pursuant to an an Rule 68, Fed. R. Civ. P. offer of judgment; and,

> (iii) whether, for purposes of determining the prevailing market rate, the relevant
> market may include consumer-rights and residential-mortgage litigation generally
> and need not consist only of TILA litigation.

For the reasons that follow, all three questions must be answered in the affirmative.

**I.**

The facts and procedural history in this somewhat protracted case are set forth in several

memorandum opinions.[2]  Nonetheless, it is necessary to recount here the facts and history

pertinent to the parties' fee dispute.

---

[1] Truth in Lending Act, 15 U.S.C. §§ 1601 *et seq.* ("TILA").

On September 20, 2006, plaintiff Norman Bradford ("Bradford") and defendant HSBC Mortgage Corp. ("HSBC") agreed to refinance the loan that had originally financed Bradford's purchase of his primary residence in Ashburn, Virginia (the "Ashburn home"). To this end, Bradford signed a promissory note (the "Note"), which was secured by a deed of trust on the Ashburn home that named HSBC as the lender. At the time of the refinancing, Bradford was not provided with a "Truth in Lending" statement that would have informed him of his right to rescind the transaction pursuant to TILA. Thus, Bradford established as an undisputed fact in this case "that various mandatory TILA disclosures were not provided at the time of closing, such that he was entitled to rescind his loan within the extended statutory three-year period." *Bradford I*, 799 F. Supp. 2d at 627. Several months after the refinancing, HSBC sold the Note to Ally Bank ("Ally") but did not inform Bradford at the time that it had transferred the Note. Indeed, Bradford had no reason to know that the Note had been transferred, as HSBC continued to service the Ashburn loan and Bradford made all loan payments to HSBC.

On September 23, 2008, Bradford sent a letter to HSBC requesting, *inter alia*, the identity of the current noteholder. On October 16, 2008, Bradford sent another letter to HSBC purporting to "exercise [Bradford's] right to rescind the mortgage transaction[.]" (Doc. 30-5). Not until nearly two months later—on November 21, 2008—did HSBC respond to Bradford's *first* letter requesting the noteholder's identity. In its response, HSBC stated—unresponsively—that Bradford's letter "does not identify which aspects of the accounting or servicing of your loan you are questioning" and failed to disclose to Bradford the identity of the then-current noteholder,

---

[2] *See Bradford v. HSBC Mortg. Corp.*, 799 F. Supp. 2d 625 (E.D. Va. 2011) ("*Bradford I*"); *Bradford v. HSBC Mortg. Corp.*, --- F. Supp. 2d ----, 2011 WL 6148486 (E.D. Va. 2011) ("*Bradford II*"); *Bradford v. HSBC Mortg. Corp.*, --- F. Supp. 2d ----, 2012 WL 603183 (E.D. Va. 2012) ("*Bradford III*"), *Bradford v. HSBC Mortg. Corp.*, --- F. Supp. 2d ----, 2012 WL 706379 (E.D. Va. 2012) ("*Bradford IV*").

which at that time was Ally. (Doc. 30-4). Almost one month later, HSBC, by letter dated

December 17, 2008, declined to honor Bradford's rescission request.

Bradford filed the instant action on October 29, 2009 alleging, *inter alia*, that HSBC had

violated § 1635 of TILA by failing to honor Bradford's request for rescission. Bradford filed an

amended complaint on August 5, 2010, although neither Ally (the noteholder from November

2006 until December 2009), nor RFC (the noteholder after December 2009), was named as a

defendant. On January 28, 2011, after the original discovery period had closed, HSBC moved

for summary judgment on the TILA claims on the ground, *inter alia*, that HSBC no longer

possessed the Note, which HSBC averred had been endorsed to Ally and was in Ally's

possession at that time. It followed, HSBC argued, that Bradford had failed to join the

noteholder, a necessary party for rescission, and that such relief was therefore unavailable.

On March 3, 2011, Bradford's current counsel entered an appearance on Bradford's

behalf. The next day, Bradford by counsel filed a legal memorandum and other materials

opposing HSBC's summary-judgment motion on the ground, *inter alia*, that there were genuine

fact issues concerning the noteholder's identity, which Bradford argued he could not determine

as his prior *pro se* motion to reopen discovery had been denied. *See Bradford v. HSBC Mortg.*

*Corp.*, No. 1:09cv1226 (E.D. Va. Jan. 21, 2011) (Order) (Doc. 85). That day, Bradford also filed

a motion to add Ally as a party based on HSBC's representation—later determined to be

inaccurate—that Ally was the then-current noteholder.[3] Bradford's motion was granted, and

Ally was added as a defendant. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va.

Mar. 11, 2011) (Order). The March 11, 2011 Order also granted the parties leave to file

---

[3] In particular, "HSBC misidentified the true noteholder (RFC) to Bradford between December
2009 (when Ally sold the Note to RFC) and May 2011 (when HSBC and Ally disclosed that
RFC was the noteholder)." *Bradford II*, 2011 WL 6148486, at *8 n.33.

3

supplemental legal memoranda on the then-pending summary-judgment motions. *Id.* On April 1, 2011, an Order issued granting the parties leave to submit additional supplemental legal memoranda in connection with the summary-judgment motions. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va. Apr. 1, 2011) (Order) (Doc. 123).

While HSBC's summary-judgment motion was pending, Bradford sought additional discovery against HSBC, MERS, and Ally, ostensibly to obtain facts relating to the noteholder-identity issue that was central to summary judgment. Bradford's first request was denied without prejudice. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va. Apr. 1, 2011) (Order) (Doc. 120). Thereafter, Bradford filed another motion for additional discovery, but this new motion sought discovery relating only to the issue of the noteholder's identity. In support of the motion, Bradford argued that the record did not establish whether the Note contained additional endorsements or whether HSBC, Ally, or some other entity actually possessed the Note at that time. This motion for limited additional discovery was granted by Order dated April 22, 2011, and Bradford was permitted to serve additional written discovery requests on HSBC. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va. Apr. 22, 2011) (Order). When HSBC failed to respond to Bradford's requests in a timely fashion, Bradford filed a motion to compel discovery responses, which was granted by Order dated May 26, 2011. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va. May 26, 2011) (Order). After Bradford filed his motion to compel, but before the May 26 Order issued, HSBC filed a pleading indicating that another entity, RFC, was actually the noteholder at that time.

Although HSBC served its written responses to Bradford's discovery requests related to the noteholder-identity issue on or around May 31, 2011, these responses were lacking in many respects, as Bradford noted in his motion for sanctions filed on June 11, 2011. Specifically,

4

Bradford pointed out that HSBC's discovery responses failed to specify, *inter alia*, (i) whether physical possession of the Note was transferred, (ii) whether the Note contained endorsements other than the endorsement from HSBC to Ally, or (iii) the entity to which HSBC, as servicer, had disbursed Bradford's mortgage payments. Bradford also noted HSBC's odd contention that in November 2006 it had transferred the Note to RFC, not Ally, in contradiction of its representation that Ally had transferred the Note to RFC in December 2009. Bradford's sanctions motion was granted, and on June 17, 2011, HSBC was sanctioned in the amount of $810.00 for failing to file timely responses to Bradford's May 4, 2011 discovery requests. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va. June 17, 2011) (Order) (Doc. 187). Later, HSBC was sanctioned again, this time in the amount of $2,500.00 for the deficiencies in its responses to Bradford's discovery requests concerning the noteholder's identity. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va. Aug. 16, 2011) (Order).

Bradford filed a third verified amended complaint on June 6, 2011. Thereafter, HSBC, along with several other defendants, moved to dismiss the TILA § 1635 rescission and wrongful failure to rescind claims as untimely. On July 22, 2011, the dismissal motions as to these claims were granted given TILA's three-year statute of repose for rescission claims. *See Bradford*, 799 F. Supp. 2d at 635. Thereafter, Bradford was allowed to file a fourth amended complaint to add a claim that HSBC violated § 1641(f)(2) by failing to respond properly to Bradford's September 2008 request for the noteholder's identity. HSBC then moved to dismiss the fourth amended complaint, arguing, with respect to the § 1641(f)(2) claim, that the claim was untimely. HSBC's motion to dismiss was converted into a motion to summary judgment pursuant to Rule 12(d), Fed. R. Civ. P. and then denied as to the § 1641(f)(2) claim on the ground that the claim had been timely asserted. *See Bradford II*, 2011 WL 6148486, at *8 n.32. Subsequently, an Order

5

issued scheduling a status conference. *See Bradford v. HSBC Mortg. Corp.*, 1:09cv1226 (E.D.

Va. Dec. 8, 2011) (Order).

  After the status conference, HSBC issued a Rule 68 offer of judgment on the § 1641(f)(2)

claim to Bradford, who allowed the offer to lapse. Subsequently, HSBC issued another Rule 68

offer of judgment, which provided as follows:

> Pursuant to Rule 68 of the Federal Rules of Civil Procedure, Defendant HSBC
> Mortgage Corporation offers that the Plaintiff Norman Bradford take judgment
> against it for a single violation of the Truth in Lending Act, 15 §USC [*sic*]
> 1641(f)(2) in the amount of FOUR THOUSAND AND ONE DOLLAR AND NO
> CENTS ($4001.00), plus costs and reasonable attorney's fees in connection with
> this claim, if provided by statute.

Bradford accepted this offer on March 9, 2012 and thereafter submitted a petition for an award of

costs and attorney's fees under TILA's fee-shifting provision, 15 U.S.C. § 1640(a)(3). Final

judgment will enter pursuant to Rule 58, Fed. R. Civ. P., once costs and attorney's fees have

been determined. The parties' dispute as to the proper award of costs and fees has been fully

briefed and argued and is now ripe for disposition.

## II.

  In his petition, Bradford seeks an award that includes, at a minimum, (i) $350.00 in costs,

(ii) $2,280 in attorney's fees incurred litigating the successful § 1641(f)(2) claim against HSBC,

(iii) $20,910 in attorney's fees incurred litigating the issue of the noteholder's identity for

purposes of obtaining a remedy under § 1635, and (iv) $3,300 in attorney's fees incurred

litigating the petition. TILA's fee-shifting provision, 15 U.S.C. § 1640(a)(3), provides that "any

creditor who fails to comply with any requirement imposed under this part . . . is liable to [the

borrower] in an amount" that includes "in the case of any successful action to enforce the

foregoing liability . . . the costs of the action, together with a reasonable attorney's fee as

determined by the court." Although it is undisputed that Bradford is entitled to $350.00 in costs

consisting solely of the filing fee, the parties hotly dispute the amount constituting "a reasonable attorney's fee[.]"  An award of fees to Bradford is mandatory under § 1640(a)(3),[4] but the *amount* of fees to award is committed to the district court's sound discretion. *See Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F. 3d 183, 185 (4th Cir. 2007). *Cf. Fox v. Vice*, --- U.S. ---, 131 S. Ct. 2205, 2214 (2011) (acknowledging that "litigation is messy, and courts must deal with this untidiness in awarding fees").

In this district and elsewhere in this circuit, attorney's-fee awards have been determined pursuant the procedure that the Fourth Circuit elucidated in *Grissom v. Mills Corp.*, 549 F.3d 313 (4th Cir. 2008).  Specifically, *Grissom* directs district courts in this circuit to (i) calculate the lodestar, which is the product of the "reasonable hourly rate" by the "hours reasonably expended," in light of the *Johnson / Barber*[5] factors; (ii) "'subtract fees for hours spent on unsuccessful claims unrelated to successful ones;'" and then (iii) "'award[] some percentage of the remaining amount, depending on the degree of success enjoyed by the plaintiff.'" *Id.* at 320–21 (quoting *Johnson v. City of Aiken*, 278 F.3d 333, 337 (4th Cir. 2002)).  In other words, the *Grissom* procedure involves "expressly taking account of [plaintiff's] unsuccessful claims and then taking a 'percentage reduction' from the traditional lodestar." *Jackson v. Estelle's Place, LLC*, 391 F. App'x 239, 243 (4th Cir. 2010). The *Grissom* procedure was intended to accommodate the Supreme Court's instruction in *Hensley v. Eckerhart* that where, as here, a plaintiff "succeeded on only some of his claims for relief," the district court must address (i) whether "plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he

---

[4] *See Jesus v. Banco Popular de Puerto Rico*, 918 F.2d 232, 234 (1st Cir. 1990).

[5] *See Barber v. Kimbrell's*, 577 F.2d 216, 226 (4th Cir. 1978) (citing *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974)).

7

succeeded," and (ii) whether "plaintiff achieve[d] a level of success that makes the hours

reasonably expended a satisfactory basis for making a fee award[.]" 461 U.S. 424, 434 (1983).

A more recent Supreme Court decision has clarified and, at least by implication, revised

the procedure that must be followed to determine a reasonable fee award. In *Perdue v. Kenny A.*,

--- U.S. ---, 130 S. Ct. 1662 (2010), the district court had awarded attorney's fees to prevailing

parties who had secured a consent decree in their § 1983 challenge to the adequacy of the foster-

care services of the state of Georgia. The award reflected the district court's decision to enhance

the lodestar by an additional 75%. On appeal, the Supreme Court vacated the award on the

ground that the district court's stated reasons failed to support the enhancement. *Id.* at 1675–77

(referring to the 75% figure as "essentially arbitrary"). In reaching this conclusion, the Supreme

Court referred to the lodestar approach as an "alternative" to the *Johnson* "method" and as "the

guiding light of our fee-shifting jurisprudence." *Id.* at 1671–72 (stressing that the lodestar

approach is "objective" and thereby "cabins the discretion of trial judges, permits meaningful

judicial review, and produces reasonably predictable results") (citation omitted).[6] The Supreme

---

[6] As one district court noted in applying *Perdue*:

> The Supreme Court has recently expressed skepticism with the propriety of the
> *Johnson* approach, arguing that it gives too little guidance to judges by placing the
> emphasis on factors and considerations that are overly subjective. Instead, it
> found that the lodestar approach provided better limits on a judge's discretion by
> making the determination more objective, providing for fee awards that are more
> predictable and less disparate. However, the *Johnson* factors, as opposed to the
> *Johnson method*, are still relevant in informing the court's determination of a
> reasonable fee and a reasonable hourly rate. *Kenny A.* cautions against using a
> strict *Johnson* approach as the primary basis for determining reasonable attorneys'
> fees, but nowhere calls into question the idea of using relevant *Johnson* factors in
> helping to come to a reasonable fee. Indeed, the Court's fears of unrestrained
> discretion in applying a pure *Johnson* approach are largely absent from the more
> cabined methods of calculating a presumptively reasonable fee in this Circuit.

Court also emphasized that the lodestar, once calculated in a particular case, is presumptively

reasonable and thus may be adjusted only "in those *rare circumstances* in which the lodestar

does not adequately take into account a factor that may properly be considered in determining a

reasonable fee." *Id.* at 1673 (emphasis added).

Thus, in light of the Supreme Court's guidance in *Perdue*, the Fourth Circuit's approach

for determining a reasonable attorney's fee as set forth in *Grissom* must be adapted in at least

two respects.[7] First, when calculating the lodestar in a case in which not all claims were

successful, the district court must attempt to determine how many hours were reasonably

expended litigating the successful claim, as well as those hours reasonably expended litigating

any unsuccessful claims that were nonetheless related to a successful claim. This determination

of reasonable expenditure of hours is appropriately guided by the *Johnson / Barber* factors.

Alternatively, the district court may add all hours spent advancing the litigation as a whole and

then reduce those hours by a fixed percentage based on the plaintiff's degree of success, but,

given the Supreme Court's admonitions in *Perdue* with respect to objectivity and reviewability,

this alternative—the fixed-percentage approach—may be used only if the record contains

insufficient evidence upon which to determine precisely how many hours were reasonably

expended litigating the successful claim and any other related claims. *See Hensley*, 461 U.S. at

---

*Jon v. Pac. Buffet House, Inc.*, No. 06cv579, 2010 WL 2653334, at *2 n.2 (E.D.N.Y. June 25, 2010).

[7] Although the effect of *Perdue* on Fourth Circuit fee-shifting jurisprudence was the object of disagreement between the majority and dissenting opinions in a recent unpublished Fourth Circuit decision, the precise effect of *Perdue* was not expressly decided. *Compare Jackson*, 391 F. App'x at 245 (concluding that "nothing in *Perdue* persuades us that the district court's reduced fee award here was in any sense 'arbitrary' or was otherwise the product of an abuse of discretion") *with id.* at 245, 249 (Gregory, J., dissenting) (contending that "fee award in this case is clearly wrong" and that "the district court's method of reducing the award by the arbitrary figure of twenty-five percent without any explanation as to how the percentage was arrived at is an abuse of discretion" under *Perdue*).

434 (noting that where a successful claim and an unsuccessful claim share "a common core set of facts," it can be "difficult to divide the hours expended on a claim-by-claim basis").[8] If the district court follows the fixed-percentage approach, it must offer an "objective and reviewable basis" supporting the particular percentage chosen. *Perdue*, 130 S. Ct. at 1676. Second, after the lodestar has been calculated, the district court must consider whether the lodestar reflects all of the *Johnson / Barber* factors, but may adjust the lodestar based only on the *Johnson / Barber* factors that are not accounted for in the lodestar figure. Again, any adjustment to the lodestar must be supported by a "objective and reviewable basis[.]" *Id.*

With these principles in mind, analysis appropriately proceeds to the determination of a reasonable attorney's fee in this case.

## III.

Distilled to its essence, Bradford's petition for costs and attorney's fees seeks compensation for the following three categories of attorney-hours: (i) those hours spent litigating the successful § 1641(f)(2) claim;[9] (ii) those hours spent litigating the issue of the noteholder's identity; and (iii) those hours spent preparing and litigating the petition itself. In determining the number of hours reasonably expended, district courts "need not, and indeed should not, become green-eyeshade accountants." *Fox*, 131 S. Ct. at 2216 (stressing that "[t]he essential goal in

---

[8] *Cited in Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 504 n.4 (4th Cir. 2001).

[9] Bradford's argument that his § 1641(g) claim was "successful" cannot be correct because this claim was dismissed as moot. *See Bradford v. HSBC Morg. Corp.*, 1:09cv1226 (E.D. Va. Feb. 23, 2012) (Order). Thus, for purposes of determining a reasonable fee award, it will be taken as given that Bradford succeeded on only one of his claims, namely, the § 1641(f)(2) claim against HSBC.

shifting fees . . . is to do rough justice, not to achieve auditing perfection").[10]  Nonetheless,

because Bradford bears the burden of establishing a reasonable fee by clear and convincing

evidence, Bradford must submit time records of work performed sufficient to allow separation of

time spent on the successful § 1641(f)(2) claim from time spent on unsuccessful claims unrelated

to the § 1641(f)(2) claim.  *Hensley*, 461 U.S. at 437.  In this respect, Bradford "must make every

effort to submit time records which specifically allocate the time spent on each claim." *Fair*

*Housing Council of Greater Wash. v. Landow*, 999 F.2d 92, 97 (4th Cir. 1993).  Moreover,

Bradford "must make some reasonable effort to weed out the fees incurred on claims [he] lost" to

the extent that those claims are unrelated to the § 1641(f)(2) claim.  *Id.*  To this end, Bradford has

submitted evidence consisting of time records and two sworn declarations from his counsel.

Although this evidence could have been more detailed, it is not so vague or unspecific as to

render impossible "an independent determination whether or not the hours claimed are justified."

*Dist. of Columbia v. Heller*, --- F. Supp. 2d ----, 2011 WL 6826278, at *13 (D.D.C. Dec. 29,

2011) (quoting *Nat'l Ass'n of Concerned Veterans v. Sec. of Def.*, 675 F.2d 1319, 1327 (D.C.

Cir. 1982)).[11]

     With respect to the first category hours—those spent litigating the successful § 1641(f)(2)

claim—review of the time records in light of the procedural history of this matter makes clear

that litigating this claim involved the following tasks:

> (i) drafting of Bradford's Fourth Verified Amended Complaint, which asserted for
> the first time the § 1641(f)(2) claim;

---

[10] *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994) (per curiam) (noting that a district court is not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items").

[11] *Accord Nat'l Ass'n of Concerned Veterans*, 675 F.2d at 1327 (noting that a fee application need not list "the exact number of minutes spent nor the precise activity to which each hour was devoted").

(ii) drafting of and attending argument on Bradford's motion for leave to file the Fourth Verified Amended Complaint;

(iii) discussing strategy with Bradford on January 26, 2012;

(iv) drafting Bradford's motion for summary judgment on the § 1641(f)(2) claim;

(v) drafting Bradford's opposition to HSBC's motion for summary judgment on the § 1641(f)(2) claim;

(vi) drafting Bradford's February 4, 2012 settlement offer;

(vii) communicating with Bradford regarding settlement offers on February 8, 2012; and,

(viii) preparing for and attending the February 10, 2012 oral argument on HSBC's motion for summary judgment on the § 1641(f)(2) claim and on Bradford's summary-judgment motion.

The records indicate that a total of 26.4 hours were spent on these tasks. Of course, as Bradford forthrightly admits, not all of these hours are attributable to the successful § 1641(f)(2) claim. Accordingly, Bradford estimates that 7.6 hours were spent litigating the § 1641(f)(2) claim specifically. Because these 7.6 hours were reasonably incurred and supported by adequate documentation,[12] they are appropriately included in the lodestar calculation.

## IV.

Analysis next proceeds to the question whether hours attributable to work on Bradford's unsuccessful TILA claims are appropriately included in the lodestar calculation. It is well-settled that the lodestar properly includes hours spent reasonably advancing unsuccessful claims to the extent that the unsuccessful claims share a "common core of facts" or are otherwise related to the

---

[12] In this respect, it is unnecessary, as a matter of judicial discretion, to reduce any further the fee request "by a stated percentage in order to address some deficiency in the application, such as redundant time entries, failure to exercise billing judgment, or excessive number of hours sought." *In re Outsidewall Tire Litig.*, 748 F. Supp. 2d 557, 565 (E.D. Va. 2010). This is so because Bradford's estimate appears to have been made in good faith and is consistent with the record evidence and reasonable inferences drawn therefrom.

successful claim. *Abshire v. Walls*, 830 F.2d 1277, 1282–83 (4th Cir. 1987) (quoting *Hensley*,

461 U.S. at 435).  In this circuit, "entitlement to fees for one aspect of a protracted litigation does

not turn narrowly on whether the party prevailed on that particular matter, but whether a separate

claim . . . is so unrelated as to justify treating it as a separate lawsuit." *Perry v. Bartlett*, 231 F.3d

155, 163 (4th Cir. 2000).  Moreover, as the Fourth Circuit has noted, "[t]he Supreme Court has

directed district courts not to draw overly fine distinctions" when determining whether claims or

issues are related, given that the determination is "not reached through application of any precise

roles or formulae, but rather through an equitable judgment of the district court exercising

discretion in light of the concerns expressed in *Hensley*." *Id.*  Indeed, *Hensley* observed that in

many cases, "much of counsel's time will be devoted generally to the litigation as a whole,

making it difficult to divide the hours expended on a claim-by-claim basis." 461 U.S. at 435.  As

a result, as *Hensley* recognized, "there is no certain method of determining when claims are

'related' or 'unrelated'." *Id.* at 437 n.12.

In this case, Bradford argues that the successful § 1641(f)(2) claim is related to the

unsuccessful TILA claims insofar as (i) litigating the issue of the noteholder's identity led to

Bradford's discovery of the § 1641(f)(2) violation, and (ii) the hours spent on the unsuccessful

TILA claims were still spent on a TILA action, which was made successful by his acceptance of

HSBC's Rule 68 offer of judgment on the § 1641(f)(2) claim.  HSBC responds that Bradford

could have filed the § 1641(f)(2) claim at the outset of this action, and that the successful §

1641(f)(2) claim is factually distinct from the unsuccessful TILA claims.

The correct conclusion occupies a middle ground between the parties' positions: the §

1641(f)(2) claim is related *in part* to the unsuccessful TILA rescission claims.  Specifically, the §

1641(f)(2) claim is related to the unsuccessful TILA rescission claims by virtue of the issue of

the noteholder's identity, which Bradford extensively litigated in pursuit of the unsuccessful claims for rescission and wrongful failure to rescind under § 1635 of TILA. For the following reasons, it is therefore appropriate to include in the lodestar calculus all hours reasonably spent litigating the issue of the noteholder's identity in pursuit of the § 1635 claims.

To begin with, the successful § 1641(f)(2) noteholder-identity claim is partly related to the unsuccessful § 1635 claims because the conduct constituting the § 1641(f)(2) violation—the failure to identify the noteholder—created the very issue that spurred so much litigation with respect to the § 1635 claims. *See Fox*, 131 S. Ct. at 2215 (announcing a causation-based "but-for test" for determining which fees in a civil-rights action would be attributable to frivolous claims in a civil rights action). Had the noteholder's identity been timely provided under § 1641(f)(2), then clearly much of the litigation effort that focused on ascertaining the noteholder's identity would have been unnecessary. Indeed, review of this case's lengthy procedural history makes clear that the substantial majority of litigation focused on which entity actually possessed the Note.[13] Given this history, the successful § 1641(f)(2) claim is related as a causal matter to the central issue litigated with respect to the unsuccessful § 1635 claims.[14]

---

[13] By failing to disclose to Bradford the noteholder's identity in violation § 1641(f)(2), HSBC substantially impeded Bradford's efforts to rescind the Ashburn loan, as he may have been entitled to do under § 1635 had his TILA action been brought against the actual noteholder within TILA's three-year statute of repose. HSBC's failure to identify the noteholder continued even after it had failed to respond to Bradford's September 2008 request to HSBC for the noteholder's identity. And, it was only in December 2011—over *two years* after Bradford had filed the instant action—and only after defendants were directed to submit documentation supporting Goeller's account of the Note's ownership history did the noteholder's identity become indisputably clear.

[14] Moreover, Bradford's unsuccessful TILA claims are partly related to his successful § 1641(f)(2) noteholder-identity claim for fee claim purposes because these claims arise from a common course of conduct, namely, HSBC's handling of Bradford's mortgage loan. *See Abshire*, 830 F.3d at 1282–83 (noting in a § 1983 action that "[t]he facts surrounding [plaintiff's]

Next, TILA's statutory purposes support the result reached here that the § 1641(f)(2)

claim is partly related to the § 1635 claims with respect to the noteholder-identity issue. *See*

*Fox*, 131 S. Ct. at 2215 (reasoning from the purpose of § 1988 to support application of a

causation-based "but-for test" for determining fees in a civil-rights action involving frivolous

claims). First, this result strengthens TILA's disclosure-at-closing requirements, which are

intended to allow the borrower to "'compare more readily the various credit terms available to

him' as well as to 'avoid the uninformed use of credit,'"[15] by discouraging a creditor-servicer,

such as HSBC here,[16] from attempting to avoid liability for disclosure violations through sale of

the loan and refusal to respond to the borrower's requests for the owner's identity until after the

three-year repose period for rescission has lapsed. Moreover, this result serves the purpose of §

1641(f)(2) because the prospect that a creditor-servicer may be liable to the borrower for fees

incurred finding the noteholder encourages the creditor-servicer to disclose the noteholder's

identity promptly and accurately. Finally, and most importantly, this result serves the purpose of

TILA's fee-shifting provision, which "subsidizes the lawsuits of meritorious plaintiffs,"[17] by

giving a lawyer sufficient incentive[18] to accept the TILA claimant's representation and litigate

the issue of the noteholder's identity—necessarily a threshold matter in a § 1635 claim—

---

strip search were inextricably intertwined with the facts surrounding his initial confrontation with the police, his arrest and later imprisonment").

[15] *Irby-Greene v. M.O.R., Inc.*, 79 F. Supp. 2d 630, 632 (E.D. Va. 2000) (quoting 15 U.S.C. § 1601(a)).

[16] HSBC falls within a very narrow category of servicers that can be liable for attorney's fees for a violation of § 1641(f)(2). Although TILA does not create a cause of action against an entity that is merely a "servicer," in this case HSBC was both a "servicer" for purposes of § 1641(f)(2) *and* a "creditor" for purposes of § 1640(a).

[17] *Nigh*, 478 F.3d at 188.

[18] *See Perdue*, 130 S. Ct. at 1672 (defining a reasonable attorney's fee as "a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious [] case").

15

notwithstanding that the § 1635 claim may ultimately be unsuccessful.[19] Thus, "[t]he reduction of an award of attorney's fees from the amount sought solely because the plaintiff was successful on only one of the several charges would be inconsistent with the Congressional policy of implementing enforcement of the Truth-in-Lending Act." *McGowan v. Credit Ctr. of N. Jackson, Inc.*, 546 F.2d 73, 77 (5th Cir. 1977).

Furthermore, the conclusion reached here that the § 1641(f)(2) claim is partly related to the § 1635 claims also finds support in *Hensley*'s directive that "the most critical factor is the degree of success obtained." *Hensley*, 461 U.S. at 436. *Accord Tex. State Teachers Ass'n v. Garland Ind. Sch. Dist.*, 489 U.S. 782 (1989) (holding that "the degree of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee") (emphasis removed); *Brodziak v. Runyon*, 145 F.3d 194, 196–97 (4th Cir. 1998) (characterizing a plaintiff's degree of success as "the most critical factor" in deciding an appropriate fee award).[20] Here, although some of Bradford's TILA *claims* was not successful, his TILA *action* was successful in two key respects: (i) Bradford obtained a judgment against HSBC for its violation of § 1641(f)(2); and (ii) the disputed issue of the noteholder's identity caused by HSBC's TILA violation was resolved and the noteholder's identity was discovered.

---

[19] A contrary conclusion would undermine the fee-shifting provision's purpose, because to allow a creditor-servicer to escape liability for attorney's fees incurred litigating the issue of the noteholder's identity in pursuit of a rescission claim dissuades a lawyer from accepting a prospective TILA claimant's case where the noteholder's identity is uncertain. Specifically, initial uncertainty as to the noteholder's identity makes it less likely that a rescission claim will be successful given that failure to locate the noteholder within three years of closing would be fatal to the rescission claim. *See Bradford I*, 799 F. Supp. 2d at 633. This uncertainty might well make a lawyer less likely to accept representation in a TILA matter involving an unidentified noteholder if hours spent finding the noteholder were not eligible for fee-shifting.

[20] It is well-settled that a district court should "not reflexively reduce fee awards whenever damages fail to meet a plaintiff's expectations in proportion to the damages' shortfall." *Nigh*, 478 F. 3d at 190.

HSBC violated a provision of TILA ostensibly intended to ensure that a borrower seeking rescission could bring a timely action to exercise his right to rescind under TILA. Thus, the inclusion in the lodestar of hours spent litigating the successful § 1641(f)(2) claim and the noteholder issue with respect to the unsuccessful § 1635 claims, together with the exclusion of hours spent litigating other aspects of the § 1635 claims, accounts for the degree of litigation success that Bradford enjoyed here.

Finally, this conclusion finds support in Fourth Circuit precedent that, while not directly on point, is nonetheless instructive. In *Nigh*, the Fourth Circuit concluded that because § 1640(a)(3) allows an award of a reasonable attorney's fee for a "successful action," "it is possible for a TILA plaintiff to obtain attorneys' fees for a stage of the litigation at which she does not prevail." 478 F.3d at 186. The Fourth Circuit thereby concluded that the TILA claimant's action was successful—notwithstanding that "many of the claims he originally brought were dismissed"—because "a jury found [defendant] to be liable to [plaintiff] under the TILA[.]" *Id.* In this respect, "[j]ust as a plaintiff can prevail when only one of his claims succeeds, so his action can succeed when only one of its constituent claims prevails." *Id.* Here, because Bradford's TILA action undoubtedly succeeded, *Nigh* supports the conclusion that the lodestar may include hours spent litigating ultimately unsuccessful claims if the TILA action itself succeeded and those unsuccessful claims are related to the successful TILA claim.

In sum, HSBC's § 1641(f)(2) violation played a causal role in the protracted litigation over the noteholder's identity and even impeded Bradford's efforts to obtain a remedy to which he may have otherwise been entitled under § 1635 had Bradford acted with greater alacrity. Bradford was entitled under TILA to know the identity of the noteholder, and only through extensive litigation effort did Bradford successfully discover information that TILA entitled him

to know.  Because TILA entitles a borrower to this information for the purpose of ensuring that

the borrower can obtain a remedy under § 1635 against the current owner of his loan obligation,

the noteholder-identity issue litigated with respect to the § 1635 claims is "inextricably

intermingled" with the successful § 1641(f)(2) claim.  *Willie M. v. Hunt*, 732 F.2d 383, 386 (4th

Cir. 1981).  It follows that any hours reasonably expended litigating the noteholder-identity issue

while the § 1635 claims remained viable are properly included in the lodestar calculation.

 Analysis proceeds to the determination of which hours were incurred litigating the

noteholder-identity issue before the TILA rescission claims were dismissed.  In a sworn

declaration, Bradford's counsel avers that hours spent on the following tasks are appropriately

included in full:

  (i) drafting the second motion for additional discovery;

  (ii) filing proposed interrogatories;

  (iii) drafting a reply supporting the additional-discovery motion;

  (iv) researching the motion to compel discovery;

  (v) drafting the third supplemental brief regarding summary judgment;

  (vi) drafting a reply to defendants' supplemental summary-judgment memorandum;

  (vii) drafting the first motion for sanctions;

  (viii) speaking with the client regarding the sanctions motion; and

  (ix) drafting a supplemental memorandum regarding the sanctions motion.

Moreover, Bradford's counsel has represented that at least some hours spent on the following

tasks concerned the noteholder-identity issue:

  (i) drafting the summary-judgment opposition, motion for joinder of Ally, and motion for leave to file an amended complaint;

  (ii) preparing for and attending the March 11, 2011 hearing;

(iii) preparing for and attending the April 1, 2011 hearing;

(iv) drafting motion for leave to file an amended complaint and opposition to dismissal motions;

(v) drafting the amended complaint;

(vi) reviewing the record and performing research;

(vii) drafting third supplemental summary-judgment memorandum and participating in conference calls;

(viii) drafting the motion to compel and supplemental brief and participating in a conference call with the Court; and

(ix) drafting a supplemental memorandum supporting the sanctions motion.

In total, Bradford estimates that of the 150 total hours his counsel spent litigating this matter before the § 1635 claims were dismissed, 64.8 of these hours were spent litigating the particular issue of the noteholder's identity.[21]  Although nearly sixty-five hours spent on a single issue might seem excessive at first glance, it cannot be said that these hours were unreasonably expended because many obstacles, including HSBC's conduct in the litigation, impeded accurate determination of the noteholder's identity.  Thus, the requested 64.8 hours reasonably spent litigating the noteholder-identity issue are appropriately included in the lodestar calculation.

## V.

Finally, Bradford seeks to include in the lodestar calculation the 11 hours his counsel expended litigating the instant petition for costs and attorney's fees.  Although HSBC does not dispute that these 11 hours were reasonably incurred, HSBC nonetheless contends that *no* such hours are properly included in the lodestar because they were incurred after the issuance of its Rule 68 offer of judgment.  In particular, HSBC argues that the Fourth Circuit's decision in

---

[21] *See supra* note 12.

*Grissom* stands for the proposition that Rule 68 *per se* disallows awards of attorney's fees incurred after the issuance of a Rule 68 offer of judgment. *See* Rule 68(a), Fed. R. Civ. P. (providing that "a party defending against a claim may serve on an opposing party an offer to allow judgment on specified terms, *with the costs then accrued*") (emphasis added). Yet, careful reading of *Grissom* in light of Supreme Court precedent and the language of Rule 68 shows HSBC to be incorrect, as the recoverability of post-offer attorney's fees turns on whether the provision of law on which the claim is based considers attorney's fees to be separate from costs.

In *Marek v. Chesny*, the Supreme Court held that "where the underlying statute defines 'costs' to include attorney's fees . . . such fees are to be included as costs for purposes of Rule 68." 473 U.S. 1, 7 (1985) (construing what is now Rule 68(d), which provides for an award of costs if the offeree obtains a judgment that is not as favorable as the offer). *Marek* rests on the commonsense proposition that "costs" under Rule 68 must be defined by reference to the relevant attorney's-fee provision. *See id.* at 9 ("[T]he most reasonable inference is that the term 'costs' in Rule 68 was intended to refer to all costs properly awardable under the relevant substantive statute[.]").[22] In other words, under *Marek*, whether "costs" under Rule 68 includes attorney's fees turns on whether the statute on which the claim is based defines "costs" to include attorney's fees. *See Nusom v. Comh Woodburn, Inc.*, 122 F.3d 830, 833 (9th Cir. 1997) ("Rule 68 incorporates the definition of costs under the relevant substantive statute.") (citing *Marek*). Thus, *Marek*'s reasoning compels the conclusion that the inverse of its holding must also be true, namely, that where the underlying statute defines 'costs' to *exclude* attorney's fees, those fees are *not* considered costs under Rule 68. *See Arencibia v. Miami Shoes, Inc.*, 113 F.3d 1212, 1214

---

[22] As the Eleventh Circuit has noted, the word "costs" should have the same meaning in Rule 68(a) and Rule 68(d). *See Arencibia v. Miami Shoes, Inc.*, 113 F.3d 1212, 1214 n.1 (11th Cir. 1997).

(11th Cir. 1997) (holding that "'costs' awarded by virtue of Rule 68 . . . only include attorney's fees if the underlying statute defines 'costs' to include attorney's fees" (citing *Marek*).

Here, because TILA's fee-shifting provision unambiguously excludes attorney's fees from costs,[23] Rule 68 does not operate to exclude from the lodestar those post-offer hours expended by Bradford's counsel.[24] HSBC was on notice when it issued its Rule 68 offer that because TILA defines costs exclusive of attorney's fees, HSBC would be liable for attorney's fees Bradford reasonably incurred preparing and litigating his fee petition. Thus, the 11 hours Bradford's counsel spent on the fees issue, which were reasonably expended, are appropriately included in the lodestar.

## VI.

In sum, the lodestar properly includes the following hours: (i) 7.6 hours spent litigating the successful § 1641(f)(2) claim; (ii) 64.8 hours spent litigating the issue of the noteholder's identity prior to the § 1635 claims' dismissal; and (iii) 11 hours spent litigating the instant fee petition. The lodestar will therefore be based on a total of 83.4 hours.

The next step in the lodestar calculation is the determination of a reasonable hourly rate, which must be based on evidence of the "prevailing market rate." *Robinson v. Equifax Information Services, LLC*, 560 F.3d 235, 244 (4th Cir. 2009) (citation omitted). The Fourth

---

[23] *See Nusom*, 122 F.3d at 834 ("There is no question that . . . TILA [does not] define[] costs as including attorney fees."); *see also Tye v. Brock & Scott, PLLC*, No. 1:09cv96, 2010 WL 428964, at *2 (M.D.N.C. Feb. 1, 2010) (concluding that the FDCPA's fee-shifting provision, which is virtually identical to TILA's fee-shifting provision, "does not define 'costs' to include attorney's fees").

[24] This conclusion is consistent with *Grissom*, in which the Fourth Circuit merely assumed without expressly deciding that the underlying statute there at issue, the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, included attorney's fees as recoverable costs. 549 F.3d at 319 n.6 ("assum[ing], *arguendo*, for purposes of addressing Defendant's argument on this issue, that Rule 68's use of the term 'costs,' *in the context of this case*, includes attorneys' fees") (emphasis added).

Circuit has defined "market rate" as "what attorneys earn from paying clients for similar services in similar circumstances[.]" *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 622 (4th Cir. 2007). Bradford argues that the rate of $300.00 per hour is reasonable in light of his counsel's eleven years of law-practice experience prior to assuming Bradford's representation in 2011. In support, Bradford has submitted sworn statements from his own counsel and from two lawyers familiar with his counsel's skills and experience and with consumer-rights and residential-mortgage litigation in this district. HSBC initially did not dispute that $300.00 is a reasonable hourly rate but now argues in its supplemental submission that Bradford has adduced insufficient evidence supporting the requested rate.

HSBC's argument that Bradford has submitted inadequate documentation supporting the requested $300 hourly rate is unpersuasive. Bradford's counsel and the two other attorney-affiants affirm that $300 is a reasonable, even low, hourly rate for a lawyer of Bradford's counsel's skill and experience in consumer-rights and residential-mortgage matters. The Fourth Circuit has held that these sorts of sworn statements are "sufficient to verify the prevailing market rates[.]" *Robinson*, 560 F.3d at 245. HSBC's argument to the contrary, to put it mildly, amounts to meritless nitpicking, as it cites no authority for the contention that supporting evidence of prevailing market rates must concern TILA matters *specifically*. To the contrary, Fourth Circuit precedent suggests that the relevant community should not be defined so narrowly. *See Spell v. McDaniel*, 824 F.2d 1380, 1402 (4th Cir. 1987) (holding that "[t]he prevailing market rate may be established through affidavits reciting the precise fees that counsel with similar qualifications have received in *comparable* cases") (emphasis added); *Plyler*, 902 F.2d at 278 (finding no error in district court's hourly-rate determinations that were based on "affidavits of South Carolina lawyers who were familiar . . . with civil rights litigation in South

22

Carolina" in a prison-conditions action brought pursuant to § 1983).[25] Instead, "the relevant market" in this case is the market for consumer-rights and residential-mortgage litigation as described in Bradford's supporting affidavits. *See Trimper v. City of Norfolk*, 58 F.3d 68, 76 (4th Cir. 1995) (emphasis removed). In sum, it is appropriate to calculate the lodestar using Bradford's proposed hourly rate of $300, which is reasonable under the circumstances.[26]

Given this, the lodestar in this case is $25,020.00, which is the product of 83.4 hours and the $300 hourly rate. No "rare" or "exceptional" circumstances warrant adjustment of the lodestar here. All applicable *Johnson / Barber* factors are already accounted in the lodestar,[27] as is *Hensley*'s instruction that the fee award reflect the successful party's degree of litigation success. In sum, because there is simply no good cause for adjustment of the lodestar, final judgment will be entered against HSBC for $4001.00 in damages, $350.00 in costs, and $25,020.00 in attorney's fees.

A final order and judgment will issue.

---

[25] *See also Buffington v. Balt. Cnty.*, 913 F.2d 113, 129–30 (4th Cir. 1990) (requiring sufficient evidence of rates "in the special field of civil rights litigation").

[26] Two other factors support the reasonableness of the $300 hourly rate. First, the Laffey Matrix, which the Fourth Circuit has called "a useful starting point to determine fees" for lawyers in the Washington / Baltimore region, supports the reasonableness of the $300 proposed rate given that the corresponding rates under the adjusted and unadjusted matrices both exceed Bradford's requested rate. *See Newport News Shipbuilding & Dry Dock Co. v. Holiday*, 591 F.3d 219, 229 n.11 (4th Cir. 2009). Second, the Magistrate Judge found previously, and without objection from HSBC, that Bradford's counsel's hourly rate of $300.00 was reasonable when the Magistrate Judge awarded sanctions for Bradford against HSBC. *See Bradford v. HSBC Mortg. Corp.*, No. 1:09cv1226 (E.D. Va. June 17, 2011) (Order).

[27] Notwithstanding the issuance of sanctions against HSBC in this matter, it is inappropriate to adjust the lodestar on that basis. The purpose of the sanction was punitive, not compensatory. The award of sanctions was for a fixed-dollar amount that did not specify the amount of hours being compensated and thus could not be properly reflected in the lodestar calculation. Finally, the sanction was not in recognition of Bradford's success in determining the noteholder's identity; to the contrary, the sanctions award recognized that HSBC had *still* not identified the noteholder to Bradford at that time.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

Alexandria, Virginia
April 26, 2012

_____
T. S. Ellis, III
United States District Judge